FILED

OCT 1 6 2024

AT 8:30 3:20 PM SMF
CLERK, U.S. DISTRICT COURT - DNJ

2021R00705/KMR

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Esther Salas |
| | : | |
| v. | : | Crim. No. 24-706 |
| | : | |
| NICHOLAS A. ALBERINO and | : | 18 U.S.C. § 1349 |
| NICHOLAS P. ALBERINO | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 371 |
| | : | 42 U.S.C. § 1320a-7b(b)(1)(A) |
| | : | 18 U.S.C. § 2 |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark,

charges as follows:

## COUNT 1
(Conspiracy to Commit Health Care Fraud and Wire Fraud)

### Background

### Individuals and Entities

1.    At all times relevant to this Indictment, unless otherwise indicated:

a.    Defendant NICHOLAS A. ALBERINO was a resident of Florida

and the father of co-defendant NICHOLAS P. ALBERINO (together, the

"ALBERINOS").

b.    Defendant NICHOLAS P. ALBERINO was a resident of Florida

and the son of co-defendant NICHOLAS A. ALBERINO.

        c.     The ALBERINOS owned and controlled the following corporate entities that did business across the country, including in New Jersey:

        i.  First Choice Medical LLC ("First Choice");

        ii.  Atlantic Power Gas & Electric LLC ("Atlantic Power");

        iii.  On Demand Medical Services Corp. ("On Demand Medical");

        iv.  R&A Medical Services Inc. ("R&A Medical"); and

        v.  Sunlight Medical Group LLC ("Sunlight Medical").

        d.     On Demand Medical, R&A Medical, and Sunlight Medical each sold durable medical equipment (together, the "ALBERINO DME Companies").

        e.     RediDoc LLC ("RediDoc") was a limited liability company located in Phoenix, Arizona which purported to be a telemedicine company doing business throughout the United States. Stephen Luke ("co-conspirator Luke") and David Laughlin ("co-conspirator Laughlin"), two co-conspirators not charged in this Indictment, owned and operated RediDoc.

        f.     Elite Healthcare Solutions LLC ("Elite") was a limited liability company and The Prudent Group, Inc. ("Prudent") was a corporation, both of which were located in Florida and did business throughout the United States. Raheel Naviwala ("co-conspirator Naviwala"), a co-conspirator not charged in this Indictment, owned and operated Elite and Prudent (together, the "Naviwala Companies").

2

## Overview of the Scheme

g.  The ALBERINOS owned and controlled companies that solicited individuals over the telephone to receive medically unnecessary durable medical equipment ("DME") and prescription medication (the "ALBERINO Call Centers"). Specifically, employees at the ALBERINO Call Centers targeted prospective patients—typically elderly individuals on Medicare—and pressured the patients over the telephone to accept certain medical items or services at "no cost" to the patient.

h.  If a patient agreed to accept an item or service, the ALBERINOS, through companies they controlled, sent RediDoc—a purported telemedicine company that co-conspirators Luke and Laughlin owned and controlled—the patient's medical information, a partial recording of the call with the patient, and pre-written doctor's orders or prescriptions (together, the "Patient Package").

i.  The ALBERINOS designed the orders and prescriptions included in the Patient Package ("Fraudulent Orders") so that they included only certain DME or other items that yielded high reimbursement payments from insurance payors to certain DME suppliers and other companies, including the ALBERINO DME Companies. The ALBERINOS did not select DME or other items for the Fraudulent Orders based on a patient's medical needs.

j.  RediDoc, in turn, sent Patient Packages to doctors who typically

3

signed the Fraudulent Orders. The doctors did so despite not having any contact with the patients or conducting a *bona fide* assessment of the patients from which the doctors could have deemed that it was medically necessary to order the DME or medications in the Fraudulent Orders.

k.  Once the doctors signed the Fraudulent Orders, the ALBERINOS directed RediDoc to steer the Fraudulent Orders to third parties with which the ALBERINOS had kickback and bribe arrangements. Ultimately, the Fraudulent Orders were filled by DME suppliers and pharmacies (the "Downstream Suppliers").

l.  The Downstream Suppliers fulfilled the Fraudulent Orders and submitted claims to health care benefit programs, including Medicare, to be reimbursed for costs the Downstream Suppliers purportedly incurred for fulfilling the Fraudulent Orders. The ALBERINOS also fulfilled Fraudulent Orders using the ALBERINO DME Companies and submitted claims to health care benefit programs, including Medicare, likewise to be reimbursed for costs the ALBERINO DME Companies purportedly incurred for fulfilling the Fraudulent Orders. These claims to the health care benefit programs were fraudulent because the items ordered by the Fraudulent Orders were not medically necessary and because they were the product of kickbacks and bribes. In some cases, the claims were fraudulent because the claimed items or services were never provided to patients.

m.  The ALBERINOS paid over $6 million in kickbacks and bribes to RediDoc in exchange for the Fraudulent Orders and received over $27 million in kickbacks and bribes from third parties in return for signed Fraudulent Orders.

4

Medicare paid out at least approximately $27 million to the Downstream Suppliers based on false and fraudulent claims submitted by the Downstream Suppliers based on Fraudulent Orders that had originated with the ALBERINOS. As a result of claims the ALBERINOS submitted directly to Medicare through the ALBERINO DME Companies, the ALBERINOS received over $1.7 million from Medicare.

## Medicare and TRICARE

n. Medicare was a federally funded program established to provide medical insurance benefits for individuals aged 65 and older and certain disabled individuals who qualified under the Social Security Act. Individuals who received benefits under Medicare were referred to as "Medicare beneficiaries."

o. Medicare was divided into four parts: hospital insurance (Part A); medical insurance (Part B); Medicare Advantage (Part C); and prescription drug benefits (Part D). Medicare Part B covered non-institutional care that included physician services and supplies, such as durable medical equipment ("DME"), that were needed to diagnose or treat medical conditions that met accepted standards of practice. Medicare Part D provided coverage for the cost of prescription drugs for individuals on Medicare. Part D coverage was managed by pharmacy benefit managers and other private companies approved by Medicare.

p. TRICARE was a federal health care benefit program for the United States Department of Defense ("DoD") Military Health System that provided health insurance coverage for DoD beneficiaries worldwide, including active-duty military service members, National Guard and Reserve members, retirees, their

5

families, and survivors. The Defense Health Agency, an agency of the DoD, oversaw and administered TRICARE.

q. Both Medicare and TRICARE were "health care benefit programs" that affected commerce as defined in 18 U.S.C. § 24(b) and "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f). "Beneficiaries" were individuals covered by these programs.

r. For a DME supplier to bill Medicare Part B, that supplier had to enroll with Medicare as a Durable Medical Equipment, Prosthetics, Orthotics, and Supplies supplier ("DME Supplier") by completing a Form CMS-855S.

s. As provided in the Form CMS-855S, to enroll as a DME Supplier, every DME Supplier had to meet certain standards to obtain and retain billing privileges with Medicare, such as, but not limited to, the following: (1) provide complete and accurate information on the Form CMS-855S, with any changes to the information on the form reported within 30 days; (2) disclose persons and organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions, such as, but not limited to, the Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)); (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

6

t.  Medicare-authorized suppliers of health care services, such as

DME Suppliers, could submit claims to Medicare only for reasonable and necessary

medical services. Medicare would not reimburse claims for items or services that it

knew were procured through kickbacks or bribes.  Medicare would not reimburse for

items or services that were medically unnecessary or not provided as represented.

By implementing these restrictions, Medicare aimed to preserve its resources,

which were largely funded by United States taxpayers, for elderly and other

qualifying beneficiaries who had a genuine need for medical services.

## Telemedicine

u.  "Telemedicine" referred to the practice of medicine by doctors

using telecommunications technology, such as video or telephone, to connect with

patients. Companies like RediDoc hired doctors and other health care providers,

purportedly to furnish telemedicine services to patients.

## The Conspiracy

2.  From in or around February 2018 through in or around April 2019, in

the District of New Jersey, and elsewhere, defendants

## NICHOLAS A. ALBERINO and
## NICHOLAS P. ALBERINO

did knowingly and intentionally conspire and agree with each other, co-conspirators

Luke, Laughlin, and Naviwala, and with others to commit certain offenses, namely:

a.  to knowingly and willfully execute a scheme and artifice to

defraud health care benefit programs, including Medicare, which was a health care

benefit program as defined under Title 18, United States Code, Section 24(b), and to

7

obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347; and

      b.     to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

## Goal of the Conspiracy

3.     The goal of the conspiracy was for the ALBERINOS and their co-conspirators to unlawfully enrich themselves by submitting and causing the submission of false and fraudulent claims to Medicare, among other health care benefit programs, for DME and prescription medication.

## Manner and Means of the Conspiracy

4.     It was part of the conspiracy that:

      a.     The ALBERINOS and their co-conspirators identified prospective patients (*i.e.,* Beneficiaries) to target for DME and prescriptions. Specifically, the ALBERINOS operated Call Centers which directly contacted prospective patients across the country via telephone, including in New Jersey, and

8

pressured the patients to agree to accept items such as DME and prescription medication, without regard for medical necessity. Portions of these calls were recorded.

b.     The ALBERINOS provided financial incentives to Call Center employees to encourage the employees to convince as many patients as possible to accept DME and other items. For example, the ALBERINOS paid higher commissions to Call Center employees who persuaded patients to accept certain DME, such as back braces, because back braces resulted in higher insurance payments to Downstream Suppliers, including the ALBERINO DME Companies. And the ALBERINOS paid higher commissions to employees who persuaded patients to accept several different types of DME in a single order, such as back, wrist, and ankle braces.

c.     To persuade patients to accept DME, the ALBERINOS instructed Call Center employees to tell patients that DME would be supplied for free, at no cost to the patients.

d.     After procuring the patients' medical information through the Call Centers, the ALBERINOS transmitted the information to RediDoc, along with recorded portions of the telephone calls with the patients, and pre-written doctor's orders and prescriptions for a doctor's signature—*i.e.*, the Patient Package.

e.     The ALBERINOS sent the Patient Packages to RediDoc so RediDoc could, in turn, provide each Patient Package to a doctor from within RediDoc's stable of doctors who would sign prescriptions and doctor's orders for

9

expensive medications and DME for the Beneficiaries—the Fraudulent Orders. The doctors—who were located in dozens of states around the country, including New Jersey—signed the Fraudulent Orders despite not having any contact with the patients or conducting a *bona fide* assessment of the patients from which the doctors could have deemed that it was medically necessary to order the DME or medications in the Fraudulent Orders.

   f. The ALBERINOS knew that the ALBERINOS themselves—not doctors or other health care professionals—selected the items and services in the signed Fraudulent Orders the ALBERINOS procured from RediDoc. For example, the ALBERINOS pre-selected prescription medications and DME for patients based on the potential for high reimbursement payments from insurance payers and not based on medical necessity.

   g. From time to time, insurance payors increased or decreased payments for certain items or services due to changes in insurance coverage. The ALBERINOS accordingly adjusted the items and services they included in the Fraudulent Orders to ensure they continued to capture high reimbursement payments and without regard to medical necessity. For example:

    i. On at least two occasions in or around March 2018, NICHOLAS P. ALBERINO asked RediDoc to "rescript" certain patients from one DME product to another product.

    ii. On or about September 6, 2018, NICHOLAS P. ALBERINO emailed a representative at RediDoc a list of patients, asking: "Can the

Physicians do a 'fresh' consultation with todays date?" to which the RediDoc representative replied: "The physicians would need a reason why they are reviewing the same consumer again. Please advise." NICHOLAS P. ALBERINO responded: "They were not eligible at the time due to home health and now they are eligible to receive dme products."

h.     The ALBERINOS, through First Choice and other companies they controlled, paid RediDoc for each Patient Package the ALBERINOS sent to RediDoc for purposes of preparing a Fraudulent Order. Specifically, the ALBERINOS typically paid RediDoc approximately $95 per patient when requesting orders for DME and approximately $115 per patient when requesting both DME and a drug prescription.

i.     Over the course of the conspiracy, the ALBERINOS paid RediDoc over approximately $6 million in exchange for causing doctors to sign Fraudulent Orders and for steering Fraudulent Orders to third parties.

j.     Co-conspirators Luke and Laughlin, through RediDoc, in turn paid doctors and other health care providers in return for signing and approving Fraudulent Orders based on the call recordings included in the Patient Packages that the ALBERINOS sent RediDoc.

k.     The doctors often approved the Fraudulent Orders without regard for a patient's medical necessity. For example, the doctors regularly signed Fraudulent Orders for orthotic braces without ever physically examining the patients.

11

l.      When RediDoc's telemedicine doctors did not sign Fraudulent Orders as expected, the ALBERINOS asked RediDoc to direct the corresponding Patient Packages to different doctors.  For example, on or about March 28, 2019, NICHOLAS P. ALBERINO emailed a list of doctors to a representative of RediDoc, asking to have the doctors removed from the "roster" so that other doctors could sign the Fraudulent Orders.

m.      After securing signed Fraudulent Orders, co-conspirators Luke and Laughlin, through RediDoc, transmitted the Fraudulent Orders to third parties at the ALBERINOS' direction.  Specifically, the ALBERINOS directed Fraudulent Orders for patients from all over the country to specific parties with which the ALBERINOS had kickback and bribe arrangements. These parties included DME suppliers, pharmacies, and entities in the business of brokering Fraudulent Orders.

n.      For example, the ALBERINOS directed thousands of Fraudulent Orders to co-conspirator Naviwala, who in turn had financial arrangements with dozens of DME suppliers, including DME suppliers located in New Jersey.  Over the course of the conspiracy, co-conspirator Naviwala paid the ALBERINOS over $25 million in return for Fraudulent Orders that the ALBERINOS had steered to his companies, Elite and Prudent.

o.      The ALBERINOS also fulfilled Fraudulent Orders, including orders for patients in New Jersey, through the ALBERINO DME Companies. Based on those Fraudulent Orders, the ALBERINO DME Companies submitted claims to insurance payors, including Medicare, for reimbursement. In submitting those

12

claims, the ALBERINOS did not disclose to Medicare the unlawful manner in which the ALBERINOS and their co-conspirators generated the Fraudulent Orders.

p.     The ALBERINOS sold Fraudulent Orders to third parties pursuant to contracts between their company, Atlantic Power, and the third parties that falsely stated that the parties intended to comply with the federal Anti-Kickback Statute.  In some cases, the contracts falsely stated that third parties would pay the ALBERINOS an hourly rate for "marketing services" when, in fact, they paid the ALBERINOS on a per-patient basis for signed Fraudulent Orders.

q.     The ALBERINOS knew that, as a result of the scheme, patients received unnecessary and unwanted items. The ALBERINOS received patient complaints, including complaints that patients had received multiple braces that they did not want. The ALBERINOS disregarded the patient complaints and at times submitted requests to RediDoc for DME orders that exceeded the scope of what the patients agreed to receive.

r.     The ALBERINOS, who resided in Florida and operated the Call Centers there, sent and received various wire communications in interstate commerce in furtherance of the scheme, including emails to representatives of RediDoc, which was located in Arizona.  For example:

i.     On or about February 15, 2018, NICHOLAS A. ALBERINO emailed co-conspirator Luke after being referred to RediDoc by another individual ("Individual 1").  NICHOLAS A. ALBERINO wrote: "[Individual 1] told us that you can give us a 24 hour turn around time on scripts [i.e., prescriptions

13

included in Fraudulent Orders]. We would like to set you up as an account payable so please provide your information for payments."

        ii.     On or about March 23, 2018, NICHOLAS P. ALBERINO emailed RediDoc information regarding a pharmacy that the ALBERINOS planned to use for referral of prescriptions in the Fraudulent Orders.  NICHOLAS P. ALBERINO wrote: "Here is the Pharmacy we will be using for RX [prescriptions]."

        iii.     On or about April 18, 2019, NICHOLAS A. ALBERINO emailed RediDoc asking for patients to be moved from one supplier code to another supplier code, *i.e.*, for Fraudulent Orders to be directed to different parties.

        s.     The ALBERINOS, through First Choice, also caused telephone calls to be made from the Call Centers in Florida to Medicare Beneficiaries (*i.e.*, patients) across the country, including in New Jersey. The ALBERINOS, through First Choice, electronically transmitted telephone call recordings to RediDoc, located in Arizona, to obtain signed Fraudulent Orders from RediDoc's doctors. For example:

        i.     On or around March 18, 2019, a representative of First Choice sent to RediDoc information about a certain patient ("Beneficiary 1"), a resident of Pennsylvania, together with a telephone call recording and pre-written Fraudulent Orders for back, ankle, elbow, hip, knee, shoulder, and wrist braces, to be signed by a doctor. The same day, RediDoc obtained signed Fraudulent Orders for all the requested braces from a telemedicine doctor located in Pennsylvania, resulting in several fraudulent claims to Medicare for DME. Beneficiary 1 never spoke with, or saw, the doctor that signed the Fraudulent Orders for Beneficiary 1,

14

and never received the DME.  As a result of the medically unnecessary Fraudulent Orders that First Choice procured for Beneficiary 1, which a DME supplier in Florida later purportedly fulfilled, Medicare paid that DME supplier approximately $2,212.

    ii.  On or about March 19, 2019, a representative of First Choice sent to RediDoc information about a certain patient ("Beneficiary 2"), a resident of New Jersey, together with a call recording and pre-written Fraudulent Orders for ankle, back, neck, elbow, knee, shoulder, and wrist braces, and a prescription for several medications. On the telephone call recording, the Call Center representative instructed Beneficiary 2 to "just say yes" to the representative's questions. The next day, RediDoc obtained a signed Fraudulent Order for a knee brace and prescription pain cream for Beneficiary 2 from a telemedicine doctor located in New Jersey.

    iii.  On or about March 28, 2019, a representative of First Choice sent to RediDoc information about certain patient ("Beneficiary 3"), a resident of Pennsylvania, together with a call recording and pre-written Fraudulent Orders for back, elbow, hip, knee, wrist, ankle, and shoulder braces.  Beneficiary 3 never spoke with, or saw, the doctor that signed the Fraudulent Orders. As a result of the medically unnecessary Fraudulent Orders that First Choice procured for Beneficiary 3, which a DME supplier in California later purportedly fulfilled, Medicare paid that DME supplier approximately $2,357.

iv.        On or about April 9, 2019, R&A Medical—an ALBERINO DME Supplier located in Florida—submitted a claim to Medicare for a back brace for a certain patient ("Beneficiary 4"), a resident of New Jersey. As a result of the claim, Medicare paid R&A Medical approximately $536. Beneficiary 4 received the brace, but never spoke with or saw the physician's assistant who purportedly ordered the brace.

t.        The ALBERINOS used the Fedwire Funds Service, an electronic funds transfer system, to wire funds to RediDoc in furtherance of the scheme, and to receive funds from co-conspirator Naviwala's company Elite in furtherance of the scheme.

u.        The ALBERINOS paid over $6 million in kickbacks and bribes to RediDoc in exchange for the Fraudulent Orders and received over $27 million in kickbacks and bribes from Naviwala and others in return for signed Fraudulent Orders. And as a result of claims the ALBERINOS submitted directly to Medicare through the ALBERINO DME Suppliers—the DME suppliers which they controlled—the ALBERINOS received over $1.7 million from Medicare.

In violation of Title 18, United States Code, Section 1349.

## COUNT 2
### (Wire Fraud)

5.      Paragraphs 1 and 3 through 4 of Count 1 of this Indictment are

realleged here.

6.      On or about April 3, 2019, in the District of New Jersey and elsewhere,

defendants

### NICHOLAS A. ALBERINO and
### NICHOLAS P. ALBERINO

having knowingly and intentionally devised and intending to devise a scheme and

artifice to defraud, and to obtain money and property by means of materially false

and fraudulent pretenses, representations, and promises, for purposes of executing

and attempting to execute such scheme and artifice to defraud, did knowingly and

intentionally transmit and cause to be transmitted by means of wire

communications in interstate and foreign commerce certain writings, signs, signals,

pictures, and sounds, namely the wire transfers described below:

| Description of Interstate Wire |
| --- |
| Transmission of $50,000 from First Choice to RediDoc via the Fedwire Funds Service on or about April 3, 2019 |

In violation of Title 18, United States Code, Section 1343, and Title 18,

United States Code, Section 2.

17

## COUNT 3
(Conspiracy to Violate the Anti-Kickback Statute)

7.     Paragraphs 1 and 3 through 4 of Count 1 of this Indictment are realleged here.

8.     From in or around February 2018 through in or around April 2019, in the District of New Jersey, and elsewhere, defendants

## NICHOLAS A. ALBERINO and
## NICHOLAS P. ALBERINO

did knowingly and intentionally conspire and agree with each other, co-conspirators Luke, Laughlin, and Naviwala, and with others, to commit certain offenses against the United States, namely:

(a)     to knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, DME and prescription medications, for which payment may be made in whole and in part under a federal health care program, namely, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)(A); and

(b)     to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service, namely, DME and prescription medications, for which payment may be made in whole and in part

18

under a federal health care program, namely, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A).

### Goal of the Conspiracy

9.     Paragraph 3 of this Indictment is realleged and incorporated herein.

### Manner and Means of the Conspiracy

10.     Paragraph 4 of this Indictment is realleged and incorporated herein.

### Overt Acts

11.     In furtherance of the conspiracy and to achieve its illegal objectives, the ALBERINOS and others committed, and caused to be committed, the following overt acts in the District of New Jersey and elsewhere:

a.     On or about March 27, 2018, NICHOLAS P. ALBERINO emailed two employees at RediDoc, copying NICHOLAS A. ALBERINO, stating the following: "[w]e were charged $95 but this customer was declined for a prescription, I thought we were not charged for that, please advise."

b.     On or about April 10, 2018, NICHOLAS A. ALBERINO emailed co-conspirator Luke and others at RediDoc, copying NICHOLAS P. ALBERINO regarding a certain DME company, stating: "Please add the attached DME to our Platform who we will be using for Medicare Braces."

c.     On or about August 16, 2018, NICHOLAS P. ALBERINO emailed an employee at RediDoc: "So we are hearing medicare now allows billing on Hips, is there a way to add the brace to our scripts?"

19

        d.      On or about March 20, 2019, Doctor 1 electronically signed

Fraudulent Orders for a knee brace and prescription pain cream for Beneficiary 2,

based on a Patient Package that First Choice had directed to RediDoc. The Internet

Protocol ("IP") address associated with Doctor 1's electronic signature confirmed

that Doctor 1 electronically signed the Fraudulent Order while located in New

Jersey.

        e.      On or about the approximate dates listed below in March 2019,

the ALBERINOS, through First Choice, sent RediDoc approximately 16 payments

totaling approximately $955,000, each of which represented a bribe and kickback to

RediDoc for Fraudulent Orders that were signed by one of RediDoc's doctors:

| Approx. Date | Approx. Amount |
|---|---|
| March 1, 2019 | $10,000 |
| March 1, 2019 | $40,000 |
| March 4, 2019 | $30,000 |
| March 5, 2019 | $100,000 |
| March 6, 2019 | $50,000 |
| March 7, 2019 | $50,000 |
| March 8, 2019 | $50,000 |
| March 12, 2019 | $100,000 |
| March 14, 2019 | $50,000 |
| March 15, 2019 | $50,000 |
| March 19, 2019 | $100,000 |
| March 21, 2019 | $65,000 |
| March 22, 2019 | $45,000 |
| March 26, 2019 | $75,000 |

20

| March 28, 2019 | $75,000 |
| March 29, 2019 | $65,000 |

      f.     On or about the approximate dates listed below in March 2019,

the ALBERINOS, through First Choice, received approximately nine electronic wire

transfers from co-conspirator Naviwala's company Elite through the Fedwire Funds

Service, totaling approximately $4,945,000, each of which represented a bribe and

kickback paid by Elite to First Choice in return for the referral of Fraudulent

Orders to Elite:

| Approx. Date | Approx. Amount |
|---|---|
| March 1, 2019 | $660,000 |
| March 5, 2019 | $400,000 |
| March 8, 2019 | $685,000 |
| March 12, 2019 | $400,000 |
| March 15, 2019 | $700,000 |
| March 19, 2019 | $400,000 |
| March 22, 2019 | $700,000 |
| March 26, 2019 | $400,000 |
| March 29, 2019 | $600,000 |

     In violation of Title 18, United States Code, Section 371.

### COUNTS 4-7
(Violations of the Anti-Kickback Statute)

12.    Paragraphs 1, 3, 4, and 11 of this Indictment are realleged here.

13.    On or about the dates listed below, in the District of New Jersey, and

elsewhere, defendants

## NICHOLAS A. ALBERINO and
## NICHOLAS P. ALBERINO

knowingly and willfully solicited and received remuneration, directly and indirectly,

overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for

referring an individual to a person for the furnishing and arranging for the

furnishing of any item and service, namely, prescription medications, DME, and

testing, for which payment may be made in whole and in part under a federal

health care program:

| Count | Approx. Date | Execution |
|-------|--------------|-----------|
| 4 | March 22, 2019 | Receipt of approximately $700,000 from Elite via the Fedwire Funds System in return for signed Fraudulent Orders |
| 5 | March 26, 2019 | Receipt of approximately $400,000 from Elite via the Fedwire Funds System in return for signed Fraudulent Orders |
| 6 | March 29, 2019 | Receipt of approximately $600,000 from Elite via the Fedwire Funds System in return for signed Fraudulent Orders |
| 7 | April 2, 2019 | Receipt of approximately $400,000 from Elite via the Fedwire Funds System in return for signed Fraudulent Orders |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A), and

Title 18, United States Code, Section 2.

22

## FORFEITURE ALLEGATIONS

1.     Upon conviction one or more of the Federal health care offenses (as
defined in 18 U.S.C. § 24) alleged in Counts 1 through 7 of this Indictment, the
ALBERINOS shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7),
all property, real and personal, the ALBERINOS obtained that constitutes or is
derived, directly and indirectly, from gross proceeds traceable to the commission of
each such offense.

## SUBSTITUTE ASSETS PROVISION

2.     If any of the above-described forfeitable property, as a result of any act
or omission by the ALBERINOS:

        a)   cannot be located upon the exercise of due diligence;

        b)   has been transferred or sold to, or deposited with, a third party;

        c)   has been placed beyond the jurisdiction of the court;

        d)   has been substantially diminished in value; or

        e)   has been commingled with other property which cannot be divided
            without difficulty,

23

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated

by 18 U.S.C. § 982(b), to seek forfeiture of any other property of the defendant(s) up

to the value of the forfeitable property described above.

A TRUE BILL

FOREPERSON

Vikas Khanna

VIKAS KHANNA
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

24

CASE NUMBER: 24-706 (ES)___

United States District Court
District of New Jersey

UNITED STATES OF AMERICA

v.

NICHOLAS A. ALBERINO and
NICHOLAS P. ALBERINO

INDICTMENT FOR

18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2

Foreperson

VIKAS KHANNA
TTORNEY FOR THE UNITED STATES ACTING
UNDER AUTHORITY CONFERRED BY 28 U.S.C. § 515

KATHERINE M. ROMANO
GARRETT J. SCHUMAN
ASSISTANT U.S. ATTORNEYS
NEWARK, NEW JERSEY
(973) 353-6095